# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

PAUL H. SCHNEIDER,
          *Defendant-Appellant.*

No. 03-30527

D.C. No.
CR-01-00110-MFM

OPINION

Appeal from the United States District Court
for the District of Oregon
Malcolm F. Marsh, District Judge, Presiding

Argued and Submitted
November 1, 2004—Portland, Oregon

Filed November 18, 2005

Before: Warren J. Ferguson, Stephen S. Trott, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Trott;
Concurrence by Judge Ferguson

## COUNSEL

Stephen R. Sady, Chief Deputy Federal Public Defender, Portland, Oregon, for the defendant-appellant.

Kathleen R. Bickers, Assistant United States Attorney, Portland, Oregon, for the plaintiff-appellee.

## OPINION

TROTT, Circuit Judge:

Paul H. Schneider appeals his ten-month prison sentence entered after his conviction for theft of government money in violation of 18 U.S.C. § 641 and Social Security fraud in violation of 42 U.S.C. § 408(a)(4). Schneider contends that (1) his Sixth Amendment rights were violated because his sentence was enhanced by judge-found facts under the then-mandatory United States Sentencing Guidelines ("U.S.S.G."); (2) the district court erred in denying him a downward departure for diminished mental capacity under U.S.S.G. § 5K2.13; and (3) the district court erred in denying him an adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.

[1] We remand to the district court for proceedings consistent with *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc). The sentencing court adjusted upwards the guideline range by six levels because the court determined that the amount of loss exceeded $30,000, but was less than $70,000. *See* U.S.S.G. § 2B1.1(b)(1)(d). The jury made no finding regarding the amount of loss beyond $1,000. Under *Ameline*, when, as here, "the record is insufficiently clear to conduct a complete plain error analysis, a limited remand to the district court is appropriate for the purpose of ascertaining whether the sentence imposed would have been materially different had the district court known that the sentencing

guidelines were advisory." *Id.* at 1074. Accordingly, we remand to the district court with instructions that the court follow the procedures outlined in *Ameline*. See *id.* at 1084-85.

**[2]** Having determined that an *Ameline* remand is required, we do not address Schneider's remaining sentencing challenges.[1]

**REMANDED**.

---

FERGUSON, Circuit Judge, concurring in the judgment:

A remand in light of *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc), is proper but insufficient to reverse the injustice that occurred at sentencing to a former United States Marine who suffers from a mental illness that first surfaced while on duty in the Far East. I concur in the result but write separately to underscore how the District Court misapprehended its departure authority and misapplied U.S.S.G. § 5K2.13, which warrants resentencing.

I.

In order to understand this case, it is necessary to set forth important facts about Schneider's mental condition and what occurred at the resentencing hearing.

From April 1997 to August 2000, Schneider, a Marine Corps veteran with serious mental disabilities that surfaced during his overseas tour of duty, was hired as a teleservices representative in the Auburn, Washington, and later Portland,

---

[1]We respectfully disagree with our able colleague's analysis of the district court's refusal to depart under § 5K2.13 of the Sentencing Guidelines. However, we need not formally respond to our colleague's analysis given that we all agree that an *Ameline* remand is necessary.

Oregon, offices of the Social Security Administration (SSA). During this period, he continued to receive disability benefits from the SSA although he earned more income per month than the minimum amount required to constitute "substantial gainful work" under Title II of the Social Security Act. Strangely, Schneider worked full time in the *same* SSA office that handled his disability case, rendering the government's negligence a proximate cause of the very employment it now claims was unlawful. The government, which apparently did nothing to determine if Schneider was employable, should not now have the right to demand that the defendant be imprisoned.

Upon resentencing in November 2003, Schneider presented evidence of his mental illness. He submitted a psychiatric evaluation prepared by Yale-educated psychiatrist Dr. Susan Fiester, in which she concluded that Schneider "suffers from a severe lifelong psychiatric disorder which is disabling. He has demonstrated symptoms of both severe Bipolar Disorder with both Manic and Depressive Episodes and ongoing symptoms of Schizophrenia."

Dr. Fiester further concluded that Schneider suffers from ongoing paranoia and delusions, particularly involving the government. In 1984, for example, Schneider experienced for the first time an acute mania while on a tour of duty of the Indian Ocean as a member of the Marine Corps. According to Dr. Fiester, Schneider's mania consisted of "not sleep[ing] for three days, [having] a tremendous surge of energy, [running] compulsively to the point of exhaustion and [thinking] the government was secretly using him as a subject for experimentation." Schneider was controlled with tranquilizers and then evacuated to Guam where he attempted to escape by jumping out of a bus window, fearing that the Marines were driving him through a live fire exercise.

Eventually, Schneider was transported to a hospital in Washington, D.C., where he spent eight months in a locked

psychiatric unit. He was released to his father after being treated for another three months in the Veteran's Administration Hospital in Arizona. After this acute manic episode, Schneider applied for Title II disability benefits in 1984.

Almost a decade later, Schneider became acutely manic on several more occasions requiring hospitalization. He developed auditory hallucinations, hearing voices primarily when he turned on the shower. Schneider was hospitalized for his mental disabilities after a lengthy high-speed chase in which he was pursued by several police cars and a police helicopter. Schneider fled the police because he believed he was participating in a training maneuver for the police department.

In addition to the foregoing manic episodes, Dr. Fiester reported that Schneider currently believes "that the government ha[s] developed machines (regulators) which they 'use against people as subterfuge.' " He believes that at times the government sends him "special messages" "as a way of 'communicating to agents,' " and that the government at times " 'put[s] [him] to the test' (e.g., when two government agents investigating his situation in Portland 'challenged him' physically . . . He ignored them, feeling they were testing him)."

Moreover, Dr. Fiester explained that Schneider's disorder is tied to his sense of entitlement relating to the government. He has a distorted view of reality whereby he believes he is entitled to work and collect benefits. This view is affected in part by the fact that Schneider's father, who performed cryptographic services and was involved in top-secret projects for the government, received special entitlements from the government for his work.

During the resentencing hearing, the District Judge first considered whether Schneider qualified for an acceptance-of-responsibility adjustment under U.S.S.G. § 3E1.1 and then addressed the submissions regarding a diminished capacity departure under U.S.S.G. § 5K2.13. The District Judge began

by discussing Schneider's demeanor and appearance at trial, stating that in all his years of experience he had only once or twice "seen such arrogance in a defendant's position, such control of the attorney, interrupting her, adding to her . . . smirking at witnesses, taking copious notes which he then passed to the attorney to guide her." He then stated that Schneider had not expressed any remorse and found the following:

> [Schneider] is an intelligent man . . . [who] knew exactly what he was doing . . . knew exactly what he was doing throughout the trial . . . knew exactly what he was doing throughout the commission of the offense . . . despite the fact that *I will recognize that he has a mental illness*, but I do not find that he is in any way changed his mind about those things and, therefore, I'm going to deny the acceptance of responsibility.

> As to diminished capacity . . . What I need to find out is whether there is any connection between a diminished capacity and the offense committed. I think whatever diminished capacity he has did not affect his commission of this crime. *I think it was totally built within him an intent to live off someone else, including the Government, and not face his own responsibility. . . .*

> When I carry over the diminished capacity and then reconsider, *in the light of the acceptance of responsibility*, I come to the same conclusion. I appreciate the report of Dr. Fiester, but I think that Dr. Fiester might have seen, but I can only surmise here, a personality which she felt supported her conclusions.

> *What I see here* is a man totally manipulative, totally understanding, knowing exactly what he is doing.

> Therefore, I'm going to stay with my previous sentence.

(emphases added). The Court then resentenced Schneider to the same sentence originally imposed.

## II.

It is correct that we need to remand to the District Court for it to determine whether Schneider should be resentenced under the post-*Booker* advisory Sentencing Guidelines (the "Guidelines"). *See United States v. Booker*, 125 S. Ct. 738 (2005). I write separately, however, because the District Court's refusal to depart under § 5K2.13 rested on two significant errors. First, that Court misapprehended its departure authority by improperly limiting its scope of review exclusively to the issue of whether Schneider understood the wrongfulness of his behavior comprising the offense, without considering the volitional aspect of § 5K2.13. Second, it misapplied § 5K2.13 by conflating the standard for acceptance of responsibility with that for diminished capacity in finding an absence of a causal link between Schneider's unchallenged mental condition and the commission of the crime in question.

## A.

In construing § 5K2.13, the District Court improperly limited its scope of review to the cognitive prong of the diminished capacity definition and completely failed to consider its discretion to depart on the basis of the separate volitional capacity prong. *See* U.S.S.G. § 5K2.13, cmt. n.1 (explaining that " '[s]ignificantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) *control* behavior that the defendant *knows is wrongful*") (emphases added). It is clear that "[s]entencing courts must consider both prongs [of the significantly-reduced-mental-

capacity definition] before making a determination about a defendant's 'reduced mental capacity.' " *United States v. McBroom*, 124 F.3d 533, 548 (3d Cir. 1997). Section 5K2.13 simply states the commonly understood principle that mental illness is as often manifested in an inability to *control* behavior a person realizes is wrongful, as it is manifested in an inability to grasp the wrongfulness of the behavior.

The sentencing hearing transcript indicates the District Judge only considered Schneider's ability to understand, not control, the wrongfulness of his behavior. In fact, that Court stated that "it was totally built within [Schneider] an intent to live off someone else . . . and not face his own responsibility," and that he is "a man totally manipulative, totally understanding, knowing exactly what he is doing." These were the only statements the District Judge made concerning Schneider's mental condition. The record certainly shows no effort exercised by the Court to consider whether Schneider, despite presumably knowing what he was doing while committing the offense in question, had the power to control his behavior or conform it to law.

Since there is a substantial risk that the District Judge erred in neither recognizing nor considering the volitional prong of the diminished capacity guideline, he misapplied the now advisory Guidelines. A district judge must consider a defendant's ability to control his or her own conduct when determining that defendant's eligibility for a downward departure under § 5K2.13.

### B.

The District Court erred not once but twice in considering whether to depart under § 5K2.13. The Court also erred by conflating the standard for an acceptance-of-responsibility adjustment under § 3E1.1 with that for a diminished capacity departure under § 5K2.13.

Before discussing the relevant error, it is important to understand first how § 5K2.13 operates. "The goal of [§ 5K2.13] is lenity toward defendants whose ability to make reasoned decisions is impaired." *United States v. Cantu*, 12 F.3d 1506, 1512 (9th Cir. 1993); *see McBroom*, 124 F.3d at 548. As such, a district court may depart downward to "reflect the extent to which the reduced mental capacity contributed to the commission of the offense." U.S.S.G. § 5K2.13. We have held explicitly that "[§ 5K2.13] requires only that the district court find *some* degree, not a *particular* degree, of causation" between the defendant's mental condition and the commission of the offense in question. *Cantu*, 12 F.3d at 1515.

In order to find an absence or existence of a causal link, the district court must necessarily first determine whether the defendant suffers from a mental illness. *See* U.S.S.G. § 5K2.13; *United States v. Silleg*, 311 F.3d 557, 564 (2d Cir. 2002) (explaining that "to establish diminished capacity a defendant must establish both 'reduced mental capacity and a causal link between that reduced mental capacity and the commission of the charged offense' ") (citations omitted). Here, the Court conceded at the sentencing hearing that "[Schneider] has a mental illness," but it did not discuss the nature or characteristics of that illness. Instead, it described it as "whatever diminished capacity [Schneider] had." The Court also doubted Dr. Fiester's findings, concluding that "Dr. Fiester might have seen . . . a personality which she felt supported her conclusions," but neither the Court nor the Government ever attempted to substitute Dr. Fiester's evaluation with their own. These statements mark the full extent of the Court's assessment of Schneider's mental condition.

With this limited information, the Court then considered the causal connection between Schneider's unchallenged mental condition and the commission of the crime (defrauding the SSA). The Court specifically found that "*whatever diminished capacity* [Schneider] had did not affect his commission

of this crime" because the Court believed that "it was *totally built within him* an intent to live off someone else, including the Government, and *not face his own responsibility*" (emphases added). Curiously, without assessing the nature of Schneider's mental illness, the Court found an absence of a causal link between that illness and the commission of the offense. In so doing, the Court effectively concluded that there existed no possibility that any mental condition Schneider had, "whatever" that might be, could have contributed to the commission of the offense since he was essentially born with an intent to cheat others without accepting his own responsibility. This blanket conclusion derives from an erroneous application of § 5K2.13.

Indeed, while the Court recognized the need to find a causal link in order to grant a § 5K2.13 departure, it explicitly stated that it "reconsider[ed]" diminished capacity "in the light of the acceptance of responsibility," strongly suggesting that the Court conflated departure standards. Whether there was a causal link, therefore, is secondary to the more fundamental error here: the Court conflated two different legal standards for determining two different downward departures.

To receive an acceptance-of-responsibility adjustment, a defendant must truthfully admit the conduct comprising the offense and manifest adequate contrition for his or her actions in a timely manner. U.S.S.G. § 3E1.1, cmt. n.1; *see United States v. Cortes*, 299 F.3d 1030, 1038 (9th Cir. 2002); *United States v. Ochoa-Gaytan*, 265 F.3d 837, 843 (9th Cir. 2001); *United States v. Flores*, 93 F.3d 587, 590 (9th Cir. 1996). This standard does not consider the defendant's mental health or whether he has the cognitive or volitional capacity to accept responsibility.

To receive a diminished capacity departure, on the other hand, a defendant is required to show "*some* degree, not a *particular* degree, of causation" between his mental impairment and the commission of the offense in question. *Cantu*,

12 F.3d at 1515; *see United States v. Leandre*, 132 F.3d 796, 803 (D.C. Cir. 1998). Because § 5K2.13 and § 3E1.1 require evidence of different elements, a court cannot lawfully interpret one standard "in the light of" the other.

Here, the record suggests the District Court did exactly that —it misapplied § 5K2.13 by conflating two legal standards. While discussing the acceptance-of-responsibility adjustment, the Court not only described Schneider's arrogance and lack of remorse but also explained that Schneider "knew exactly what he was doing throughout the commission of the crime." This statement speaks more to whether Schneider's mental condition contributed to the commission of the crime than to whether he accepted responsibility *now* for the crime he knowingly committed *then*.

Similarly, when the Court shifted to discussing diminished capacity after discussing acceptance of responsibility, it stated that "[a]s to diminished capacity, I carry over the same thing," suggesting that it was carrying over the same analysis from acceptance of responsibility. The Court then concluded that it was "totally built within [Schneider] . . . not to face his own responsibility," which speaks more to whether he was able to accept responsibility than to whether his long history of schizophrenia and bipolar affective disorder may have affected to some degree his decision to continue unlawfully to collect disability benefits from the SSA. The District Judge blurred these two standards and misapplied § 5K2.13 by viewing it "in the light of" § 3E1.1.

This case, in fact, is a compelling example of the risks involved in considering diminished capacity in light of acceptance of responsibility. Dr. Fiester noted in Schneider's psychiatric evaluation that "[his] severe mental illness [was] directly related to his inability to appropriately indicate his guilt, remorse and full acceptance of responsibility for his fraudulent acts." She further explained:

> Although [Schneider] may appear to have under-
> stood the wrongfulness of his behavior on a superfi-
> cial level, his severe psychiatric illness, particularly,
> his thought disorder, paranoia and delusions about
> the government and the grandiosity and sense of
> entitlement relating to the Bipolar aspects of his dis-
> order, caused him to have a distorted view of reality,
> and to deny and 'justify' his actions.

Even if Dr. Fiester is incorrect as to the effect of Schneider's particular mental illness on his ability to accept responsibility, her analysis underscores a significant legal question. If the purpose of § 5K2.13 is lenity toward those impaired by mental illness, then preventing someone like Schneider from qualifying for a diminished capacity departure in part because his mental illness makes it difficult or even impossible for him to accept responsibility for his actions defies that very purpose.

Accordingly, in determining whether to grant a downward departure on the basis of diminished capacity, a court cannot consider diminished capacity "in the light of" acceptance of responsibility. This is a misapplication of the Guidelines.

## III.

The District Judge improperly reviewed only the cognitive prong of the diminished capacity definition and conflated the standard for an acceptance-of-responsibility adjustment under § 3E1.1 with that for a diminished capacity departure under § 5K2.13. Resentencing is entirely warranted in light of these significant errors.