**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RAMI GHANEM,

*Defendant-Appellant.*

No. 22-50266

D.C. No. 2:15-cr-00704-FLA-1

OPINION

Appeal from the United States District Court
for the Central District of California
Fernando L. Aenlle-Rocha, District Judge, Presiding

Argued and Submitted June 7, 2024
Pasadena, California

Filed July 17, 2025

Before:  Richard R. Clifton, Daniel P. Collins, and Kenneth
K. Lee, Circuit Judges.

Opinion by Judge Collins;
Concurrence by Judge Collins

# SUMMARY[*]

## Criminal Law

The panel affirmed the 360-month sentence imposed at resentencing on six counts to which Rami Ghanem pleaded guilty in a case in which Ghanem sought to export military equipment from the United States to Libya.

The district court resentenced Ghanem on remand after this court vacated his jury conviction for conspiring to acquire, transport, and use surface-to-air missiles in violation of 18 U.S.C. § 2332g.

The panel rejected all of Ghanem's arguments that the district court committed significant procedural error at resentencing. The panel held that the district court applied the correct legal standards in declining to reduce Ghanem's offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility, and did not clearly err in finding that evidence of Ghanem's failure to accept responsibility outweighed his guilty plea and truthful admissions. As to the district court's decision to depart and vary from the Sentencing Guidelines range, the panel held that (1) the district court adequately explained its sentencing decision, (2) the district court did not fail to address Ghanem's argument that a significant upward deviation from the guidelines was inconsistent with the need to avoid unwarranted sentencing disparities among similarly situated defendants, (3) no special procedural limitations apply to the consideration of large enhancements based on conduct underlying dismissed charges, and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

(4) because § 2332g applies extraterritorially to Ghanem's overseas conduct, the district court did not err "by relying on foreign conduct that may not even have been criminal."

Rejecting Ghanem's argument that the sentence is substantively unreasonable, the panel held that the district court did not abuse its discretion in concluding that a 360-month sentence was warranted under the 18 U.S.C. § 3553(a) factors.

The panel rejected Ghanem's arguments that, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, his sentence violates the Fifth Amendment Due Process Clause and the Sixth Amendment right to a jury trial.

Concurring, Judge Collins wrote separately to point out how this case illustrates a troubling feature of the precedent this court must apply. Under the statutes enacted by Congress and under the Sixth Amendment as construed in Part I of the opinion in *Booker v. United States*, 543 U.S. 220 (2005), Ghanem's sentence is patently unlawful, because the facts necessary to justify exceeding the guidelines range were found by the district judge rather than established by a jury verdict or by the defendant's admissions. But the panel must uphold the sentence because Part II of *Booker* eliminated the predicate for Ghanem's Sixth Amendment claim by deleting two of the Sentencing Reform Act's provisions and then adding a new, judge-made "reasonableness" review requirement.

## COUNSEL

A. Carley Palmer (argued) and Annamartine Salick, Assistant United States Attorneys; Bram M. Alden, Assistant United States Attorney, Chief; Criminal Appeals Section; E. Martin Estrada, United States Attorney; Office of the United States Attorney, United States Department of Justice, Los Angeles, California; for Plaintiff-Appellee.

Benjamin L. Coleman (argued), Benjamin L. Coleman Law PC, San Diego, California, for Defendant-Appellant.

## OPINION

COLLINS, Circuit Judge:

After undercover federal agents conducted a sting operation in which Defendant Rami Ghanem sought to export military equipment from the United States to Libya, Ghanem pleaded guilty to two counts of violating the Arms Export Control Act ("AECA"), *see* 22 U.S.C. § 2778; one count of conspiring to violate the AECA and its regulations, *see* 18 U.S.C. § 371; one count of unlawful smuggling, *see* 18 U.S.C. § 554; and two counts of money laundering, *see* 18 U.S.C. § 1956(a)(2)(A). But Ghanem proceeded to trial on a remaining charge that he had conspired to acquire, transport, and use surface-to-air anti-aircraft missiles (again for use in Libya) in violation of 18 U.S.C. § 2332g, which carries a 25-year mandatory minimum. Ghanem was found guilty and was sentenced to 360 months of imprisonment, which was within the applicable guidelines range of 292–365 months. The 360-month total sentence rested on two

independent concurrent groups of sentences: (1) a 360-month sentence for the § 2332g count alone; and (2) a package of concurrent and consecutive sentences on the remaining six counts that also yielded an aggregate 360-month sentence. On appeal, we vacated Ghanem's § 2332g conviction due to a defective jury instruction on venue, and we remanded for resentencing. *United States v. Ghanem*, 993 F.3d 1113 (9th Cir. 2021). At resentencing on the remaining six counts, the district court calculated the guidelines range as now being 78–97 months. Nonetheless, the court ultimately adopted the same above-described second package of sentences as before, and Ghanem was once again sentenced to 360 months of imprisonment.

Ghanem appeals, challenging his sentence on multiple grounds. We affirm.

## I

## A

Defendant Rami Ghanem, a Jordanian-born naturalized U.S. citizen, first came to the attention of federal authorities in May 2014, shortly after he sent an email to a "Los Angeles-based manufacturer of military equipment" seeking to establish, as he put it, a "cooperative relationship to supply our customers in Jordan (military and security) with your line of products." Federal authorities quickly verified that Ghanem lacked any license from the U.S. to engage in international arms transactions, and they decided to investigate further.

Shortly thereafter, an undercover federal agent, posing as a business owner who sold weapons on the "black market," began contacting Ghanem. They had a series of telephone conversations over the ensuing months, and they

met in person in Athens, Greece on March 10 and 11, 2015. In telephone conversations in August 2015, they discussed their first planned shipment, which would involve shipping pistols, rifles, ammunition, and "night vision" goggles or scopes to Libya. They agreed that the shipment would be falsely labeled, ultimately deciding to list the contents in the shipping documents as "industrial equipment." On December 8, 2015, Ghanem arrived at a warehouse in Athens to inspect the planned shipment, but upon arrival he was instead arrested by Greek authorities. These authorities seized two cell phones that were in Ghanem's possession, and they conducted a later search of his Athens hotel room that yielded multiple other electronic devices containing a wealth of information about Ghanem's arms-trafficking activities.

Two weeks later, Ghanem was indicted in the Central District of California on four charges arising from the planned weapons sale. Ghanem was subsequently extradited from Greece and was arraigned in the Central District in April 2016. A superseding indictment adding three additional charges was filed in March 2017. On the day before his scheduled trial in October 2018, Ghanem pleaded guilty, without a plea agreement, to all four of the counts in the original indictment and to two of the three counts in the superseding indictment.

Count one of the original indictment charged Ghanem with attempted export of various munitions without the necessary license, in violation of the AECA, 22 U.S.C. § 2778(b)(2), (c). At the plea hearing, the factual basis for this charge was that Ghanem, with the intent to accomplish the unlicensed export to Libya, "took a substantial step toward actually exporting" the designated "pistols, rifles, ammunition, and night-vision goggles" by causing a co-

conspirator on September 2, 2015 "to wire $89,971 from a bank account in Jordan" to the undercover agent's bank account in the Central District. Based on the same wire transfer and on Ghanem's agreement to falsely identify the shipment on the export documents, Ghanem also pleaded guilty to a violation of 18 U.S.C. § 554(a), namely, his attempted buying of such items for subsequent unlawful export in violation of the AECA (count two). Counts three and four alleged two counts of money laundering in violation of 18 U.S.C. § 1956(a)(2)(A), namely the transferring of funds from outside the United States to an account inside the United States with the intent to promote the violations alleged in counts one and two. The factual basis for Ghanem's plea to these charges was the above-mentioned wire transfer (count three) and a subsequent wire transfer in the same amount on October 22, 2015 (count four).

Count one of the superseding indictment alleged a conspiracy, in violation of 18 U.S.C. § 371, to violate (1) the AECA's requirement, in 22 U.S.C. § 2778(b)(1), to obtain a license before engaging in "brokering activities" involving designated defense articles; (2) the AECA's prohibition on unlicensed export of such defense articles in violation of 22 U.S.C. § 2778(b)(2); and (3) the prohibition, in the AECA's implementing regulations, on making certain proposals to export such defense articles without a license, *see* 22 C.F.R. § 126.1(e)(1). At the plea hearing, Ghanem agreed that he "became a member of the conspiracy knowing of these objects." The indictment alleged 44 overt acts in support of this conspiracy, but Ghanem's plea to this count was taken based on only one of them, namely, that on March 11, 2015, he met with the undercover agent for the purpose of purchasing and exporting, without the required license, "PVS-27 night-vision weapon sights." Count two of the

superseding indictment charged Ghanem with engaging in brokering activities with respect to 100 different types of defense articles, without the required license, in violation of 22 U.S.C. § 2778(b)(1)(A)(ii). In articulating a factual basis for this charge, the prosecutor only identified one such category that Ghanem had brokered, namely, "12.7 millimeter NSVT machine guns."

## B

The third and last count of the superseding indictment alleged a conspiracy to acquire, transfer, and use surface-to-air missiles designed to destroy aircraft ("SAMs"), in violation of 18 U.S.C. § 2332g. Ghanem proceeded to trial on this charge. The evidence at trial showed that Ghanem, while working for a Jordanian company called "Gateway to MENA" (referring to the Middle East and North Africa), was involved in several transactions involving SAMs.

For example, Ghanem arranged in 2015 for SAMs to be transferred to "Libya Dawn," an insurgent group that claimed to be the government of Libya and that was fighting against the U.S.-recognized government. In connection with this transaction, Ghanem worked with another employee of Gateway to MENA in preparing an "end-user certificate," which is a document needed in international arms transactions to identify the ultimate user of the weapons involved. Ghanem handwrote a draft of the document, purporting to be from the unrecognized, insurgent Libyan government, and later sent an official-looking version to a Ukrainian state-owned arms company with a cover letter asking about purchasing the items listed. Among the items requested were 50 "Igla" SAMs and five Igla launchers. Around the same time, he sent a photograph of a SAMs launcher to a Georgian weapons broker, who worked

through a company registered in Belize. About a week later, the Georgian responded by sending back both Ghanem's end-user certificate listing the SAMs and launcher, as well an invoice for $297,000 from his Belize-registered company, ostensibly for 1200 computer hard drives. A federal agent opined that this invoice was not, in fact, for hard drives, but for the purchase of weapons associated with the fraudulent end-user certificate.

A few weeks after that, Ghanem also had a series of email exchanges with the Georgian broker about hiring a crew to operate Igla SAMs and other equipment in Libya. In the same time frame, Ghanem also communicated with a retired general from the Jordanian army about Ghanem's efforts to acquire crew members to operate Iglas in Libya. In one such email to the retired general, Ghanem attached a $409,000 invoice for "training" from the Georgian's Belize company, and Ghanem explained that it would cover a variety of systems, including Iglas. The general responded by stating that he thought, based on the cost of each item (including the $30,000 he attributed to the Igla crews), the total invoice should only be for $398,000. Shortly thereafter, $398,000 was wired from Gateway to MENA to the Georgian's Belize company.

Two months later, in April 2015, Ghanem had a further email exchange with the Georgian broker, in which Ghanem complained about changes in pricing for the Igla operators. Ghanem told the broker, "[w]e agreed on the following: One operator for Igla[.] [H]e gets 10,000 for 2 months and they get as a bonus 50,000 for each plan[e] he sh[o]t[]down." Later that month, Ghanem communicated by email with the Jordanian retired general about passports and travel arrangements to Libya for two SAMs operators and a third person who recruited them. Ghanem then reached out

directly to the recruiter about the travel arrangements. Deposition testimony from these two SAMs operators and the recruiter was played at trial. One of the operators described the SAMs as being "Strela systems" rather than "Igla systems," although he acknowledged that the two were "almost identical." The recruiter explained that the Igla systems they saw in Libya were inoperable but that the Strela systems were in "very good condition." The recruiter also confirmed Ghanem's role in arranging travel and payment for the operators, and he specifically confirmed that Ghanem agreed to pay a $50,000 bonus for each aircraft shot down. However, the recruiter testified that, to his knowledge, neither of the operators shot down any aircraft.

The jury convicted Ghanem on the § 2332g charge. In August 2019, the district court sentenced Ghanem to 360 months of imprisonment. Specifically, Ghanem was sentenced to 240 months of imprisonment on count one of the indictment (the § 2778(b)(2) munitions export charge), to run consecutively with 120 months of imprisonment on count two (the § 554(a) smuggling charge). As to the remaining counts of conviction, which all ran concurrently, Ghanem was sentenced to 240 months on each of the two § 1956(a)(2)(A) money laundering charges (counts three and four of the indictment), 60 months on the § 371 conspiracy charge (count one of the superseding indictment), 240 months on the § 2778(b)(1)(A)(ii) brokering charge (count two of the superseding indictment), and 360 months on the § 2332g charge (count three of the superseding indictment). This total sentence was five years above the statutory mandatory minimum for the § 2332g charge, *see* 18 U.S.C. § 2332g(c)(1), and within the applicable guidelines range, which was 292–365 months.

## C

On appeal, we vacated Ghanem's § 2332g conviction on the ground that the jury had received improper instructions with respect to the disputed issue of venue. *Ghanem*, 993 F.3d at 1130, 1133–34. On remand, the Government agreed to dismiss the § 2332g charge without prejudice. Because the district judge who presided at Ghanem's trial had retired, a different judge presided at Ghanem's resentencing.

The Probation Office's presentence investigation report ("PSR") calculated Ghanem's sentencing guidelines range as follows. The PSR noted that, under United States Sentencing Guidelines ("U.S.S.G.") § 2S1.1(a)(1), the base offense level for the money laundering counts would be determined by the offense level for the arms-trafficking counts, which, under U.S.S.G. § 2M5.2(a)(1), was 26. The PSR then added two levels because Ghanem was convicted under 18 U.S.C. § 1956. *See* U.S.S.G. § 2S1.1(b)(2)(B). The result was an offense level of 28 for the money laundering counts, and because all of the offenses grouped together under U.S.S.G. § 3D1.2, that became the final offense level under the PSR's calculations. Because Ghanem had no criminal history, his criminal history category was I, and his resulting sentencing range was 78–97 months. However, the probation officer recommended that the district court depart or vary upward from the guidelines and impose an aggregate sentence of 240 months.

In his sentencing papers, Ghanem argued that he should receive a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, which would yield a guidelines range of 63–78 months, and he sought a within-range sentence of 77 months. The Government sought an aggregate sentence of 360 months, arguing that, despite the

vacatur of the jury verdict, Ghanem's relevant "conduct remains exactly the same" as at the first sentencing and that "[t]he appropriate sentence for that conduct also remains the same."

At Ghanem's resentencing hearing, the district court "decline[d] to apply the two-level downward adjustment for acceptance of responsibility." The district court therefore agreed with the PSR's calculation of the guidelines range as being 78–97 months. The district court nonetheless sentenced Ghanem to an aggregate term of 360 months of incarceration, to be followed by a three-year term of supervised release. Specifically, with the exception of deleting the prior concurrent sentence on the now-vacated § 2332g charge, the district court imposed the exact same term of imprisonment on each of the remaining six counts as had been imposed at the previous sentencing: 240 months on the § 2778(b)(2) munitions export charge, followed by a consecutive 120-month sentence on the § 554(a) smuggling charge; concurrent sentences of 240 months on each of the money laundering charges; a concurrent sentence of 60 months on the conspiracy charge; and a concurrent sentence of 240 months on the § 2778(b)(1)(A)(ii) brokering charge.

In imposing this above-guidelines sentence, the court stated that there were grounds for both an upward departure and an upward variance. The district court noted at the outset that it was allowed to consider the conduct underlying the vacated § 2332g count, either for purposes of choosing a sentence within the guidelines range or for purposes of deciding whether to depart or vary from that range. *See* U.S.S.G. § 1B1.4 (citing 18 U.S.C. § 3661); *see also* U.S.S.G. § 5K2.21. The court therefore concluded that Ghanem's "relevant conduct remains unchanged from the time that Judge Otero, the trial judge, imposed sentence in

2019." As specific grounds for departure, the court pointed first to application note 2 to § 2M5.2, which authorizes an upward departure when certain aggravating features, such as the "volume of commerce involved," are "present in an extreme form." U.S.S.G. § 2M5.2, cmt. n.2. It also cited § 5K2.14, which allows for an upward departure when "national security ... was significantly endangered." U.S.S.G. § 5K2.14.

In finding these departure grounds applicable here, and in deciding to vary from the guidelines under 18 U.S.C. § 3553, the court emphasized what it considered to be the "extreme facts" of this case. As the court found, Ghanem had made his living for several years as a "black market arms trafficker," dealing in a variety of "weapons of war, including trading in machine guns and assault rifles and rockets and mortars and rocket-propelled grenades and anti-tank weapons." The district court summarized the above-described two main transactions that were a focus of the charges, namely, the planned shipment of various arms from Greece to Libya through an undercover federal agent and the deal with the Georgian broker concerning the delivery and operation of SAMs in Libya. The district court also cited several additional examples of Ghanem's black-market arms-trafficking activities. These included Ghanem's efforts in September 2013 "to acquire surface-to-air missiles and missile launchers on behalf of a foreign government" that would be "covertly supplied" to, *inter alia*, "the Kurdish region of Iraq," and Ghanem's "repeated offers to a foreign government" in July 2014 "to sell weapons, including 400 Strela . . . surface-to-air missiles" that Ghanem said were "available for immediate shipment." The district court also alluded to evidence showing that Ghanem had mentioned, in his discussions with the undercover agent, that he was able

to deliver arms on a massive scale, including a deal involving "100 million" rounds of AK-47 ammunition; that Ghanem at one point sought from the agent "as many as you have" of a variety of heavy arms; and that Ghanem also bragged to the agent about his ties to various governments and militias, including Hezbollah.

The district court stated that, in undertaking his black-market arms-trafficking, Ghanem was "indifferent to the consequences of his actions" and "was motivated solely by profit." According to the court, "Ghanem's own words, written and spoken, demonstrated a lack of respect for human life." The court further found that "Ghanem's conduct unequivocally endangered the security and foreign policy interests of the United States as well as the safety and security of far less stable nations."

The district court described Ghanem's personal history, medical problems, and various letters submitted on his behalf, and the court stated that it had considered this "personal history and background in determining the appropriate sentence." Despite these considerations, the district court concluded that "a significant upward variance and departure is warranted given the extremely serious and callous nature, breadth, volume, duration, planning, and sophistication of Mr. Ghanem's offenses, and the threat to the security and foreign policy interest of the United States and the security of more vulnerable nations." The court also rejected Ghanem's argument that a 360-month sentence would produce unwarranted sentencing disparities. *Cf.* 18 U.S.C. § 3553(a)(6).

Ghanem timely appealed his sentence. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II

Before reviewing the substantive reasonableness of Ghanem's sentence, "we first consider whether the district court committed significant procedural error," *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc), "such as failing to calculate (or improperly calculating) the [g]uidelines range, treating the [g]uidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the [g]uidelines range," *Gall v. United States*, 552 U.S. 38, 51 (2007). Ghanem asserts a variety of procedural challenges on appeal, but none of them are meritorious.[1]

## A

Because the federal sentencing guidelines are "the starting point and the initial benchmark" in "all sentencing proceedings," we first address Ghanem's contention that the district court committed the procedural error of failing to "correctly calculat[e] the applicable [g]uidelines range." *Gall*, 552 U.S. at 49. Specifically, Ghanem contends that the district court erred in failing to reduce his offense level by two levels under U.S.S.G. § 3E1.1 for acceptance of

---

[1] We generally review procedural challenges to a sentence for abuse of discretion, and we review the factual determinations underlying a sentence for clear error. *United States v. Spangle*, 626 F.3d 488, 497 (9th Cir. 2010). The Government argues, however, that most of Ghanem's procedural claims "were not raised before the district court and are therefore reviewed for plain error only." Ghanem vigorously disagrees, contending that he adequately preserved all of his claims of error in the district court. We need not resolve this issue. Even applying *arguendo* the more favorable standards of review that Ghanem advocates, we conclude that his procedural claims all fail.

responsibility. "A district court's decision about whether a defendant has accepted responsibility is a factual determination reviewed for clear error," *United States v. Rosas*, 615 F.3d 1058, 1066 (9th Cir. 2010) (citation omitted), but we "review de novo whether the district court misapprehended the law with respect to the acceptance of responsibility reduction," *United States v. Green*, 940 F.3d 1038, 1041 (9th Cir. 2019) (citation omitted). Applying these standards, we uphold the district court's decision not to apply the two-level adjustment.

**1**

Before turning to Ghanem's particular arguments on this score, we first summarize the district court's stated reasons for denying an adjustment for acceptance of responsibility.

In addressing this issue, the court first examined several of the "considerations" that the guidelines' commentary identifies, in application note 1, as being relevant to the issue of acceptance of responsibility. *See* U.S.S.G. § 3E1.1, cmt. n.1. The court concluded that Ghanem's "decision to plead guilty does not demonstrate timeliness in accepting responsibility" because "he did so on the eve of trial after several years of litigation." The court also stated that Ghanem "did not voluntarily terminate his criminal conduct," did not make voluntary restitution, or "voluntarily surrender to authorities or assist authorities in the recovery of the fruits and instrumentalities of his offenses," and that he "declined to speak about the offense" with the probation officer who was preparing his presentence report.

Having ticked through the various factors in application note 1, the court then turned to application note 3 to § 3E1.1. Paraphrasing that note, the district court stated that "entry of a guilty plea prior to commencement of trial and truthfully

admitting the conduct comprising the offenses of conviction, combined with truthfully admitting or not falsely denying additional relevant conduct, is evidence of acceptance of responsibility," but that "this evidence may be outweighed by conduct that is inconsistent with acceptance of responsibility." The district court then held that, based on its "review of this file," Ghanem had not "accepted true responsibility for the full scope of his conduct." Rather, the court explained, he had "minimized his involvement," by arguing, for example, that "he was not an international arms dealer" and that his foreign conduct merely involved discussions of deals with "foreign governments" that never "materialized." Finally, the court noted that Ghanem had "declined to speak with the Probation Office about the offenses to which he pleaded guilty."

**2**

At the outset, Ghanem argues that the district court applied the wrong legal standards in assessing acceptance of responsibility, because it failed to start from the premise that "a guilty plea supported by truthful admissions by the defendant creates a presumption that the defendant will receive the acceptance-of-responsibility reduction." *Green*, 940 F.3d at 1042. We disagree.

In stating that the guidelines "suggest" such a presumption, we relied in *Green* on application note 3. *See* 940 F.3d at 1042 (citing U.S.S.G. § 3E1.1, cmt. n.3 and *United States v. Vance*, 62 F.3d 1152, 1158 (9th Cir. 1995) (also relying upon U.S.S.G. § 3E1.1, cmt. n.3)). That application note states, in full:

> Entry of a plea of guilty prior to the commencement of trial combined with

truthfully admitting the conduct comprising
the offense of conviction, and truthfully
admitting or not falsely denying any
additional relevant conduct for which he is
accountable under §1B1.3 (Relevant
Conduct) (*see* Application Note 1(A)), *will
constitute significant evidence* of acceptance
of responsibility for the purposes of
subsection (a). However, this evidence *may
be outweighed* by conduct of the defendant
that is inconsistent with such acceptance of
responsibility. A defendant who enters a
guilty plea is not entitled to an adjustment
under this section as a matter of right.

U.S.S.G. § 3E1.1, cmt. n.3 (emphasis added). Here, as
noted, the district court specifically cited this note and
paraphrased all three of its sentences, sometimes replicating
verbatim entire phrases. In nonetheless arguing that the
court failed to apply the note's standards, Ghanem
emphasizes that, in its paraphrase of the first sentence, the
district court omitted the word "significant" and instead said
only that a guilty plea accompanied by truthful admissions
"is *evidence* of acceptance of responsibility" (emphasis
added). Considering the district court's comments in full
context, we reject Ghanem's effort to attach talismanic
significance to the omission of this one word. The overall
thrust of the court's recitation reflects its awareness that the
central question was whether there was "conduct of
[Ghanem] that is inconsistent with . . . acceptance of
responsibility" and that "outweighs" the showing otherwise
established by his guilty plea and truthful admission to the
factual basis for the convictions. *Id*. We are therefore

satisfied that the court applied the correct legal standards under *Green*.

Moreover, we discern no clear error in the district court's ultimate finding that there was sufficient countervailing evidence that Ghanem had failed to accept responsibility. Conduct that is "inconsistent" with acceptance of responsibility "can include, for example, falsely denying, or frivolously contesting, relevant conduct that the court determines to be true." *Green*, 940 F.3d at 1042–43 (simplified). Another "example of inconsistent conduct that weighs against a finding of acceptance of responsibility is a defendant's attempt to minimize his own involvement in the offense," including "through his lawyer." *United States v. Scrivener*, 189 F.3d 944, 948 (9th Cir. 1999). Here, the district court pointed to such evidence in the record, specifically noting that Ghanem's counsel at the first sentencing had "minimized Mr. Ghanem's involvement" by "argu[ing] that he was *not* an international arms dealer" (emphasis added), and that Ghanem's papers in connection with the resentencing similarly argued that "virtually[] all of his foreign conduct involved discussions" about arms deals "almost none of [which] ever materialized." The district court did not clearly err in rejecting this minimization, which was flatly inconsistent with its findings that Ghanem's offenses of conviction were part of a pattern of black-market arms dealing that had gone on for several years. And those latter findings are amply supported by the record evidence we have summarized above, including Ghanem's own many statements to the undercover federal agent about his activities. *See supra* at 13–14.

Ghanem further argues that the district court erred by reciting and relying upon additional factors that did not properly bear on whether he had accepted responsibility. We

reject this contention. As we have explained, prior to turning to application note 3, the district court began by ticking through the various "considerations" that are enumerated in application note 1 as being potentially reflective of acceptance of responsibility, including "voluntary termination [of] criminal conduct" or "voluntary payment of restitution." *See* U.S.S.G. § 3E1.1, cmt. n.1(A)–(H). As the district court recognized as it worked through this checklist, most of these considerations were inapplicable here. We do not construe the district court's discussion on this score as signaling that the court was thereby *faulting* Ghanem and weighing the absence of such factors affirmatively against him. Rather, the court was simply noting the absence of these particular types of "evidence supporting the defendant's claim of acceptance, but that is not the same thing as treating [that absence] as a factor weighing against him." *Vance*, 62 F.3d at 1157. Having thus recognized that the affirmative evidence of acceptance of responsibility came down simply to Ghanem's guilty plea to all remaining charges and his associated admissions, the district court then turned to application note 3, which addresses how to analyze that issue. While the district court's examination of the various considerations listed in application note 1 was perhaps unnecessary, we cannot say that it introduced prejudicial error into the court's analysis of the acceptance-of-responsibility issue.[2]

---

[2] The only factor from application note 1 that the district court referenced in its analysis under application note 3 was Ghanem's declining to speak with the probation office. But given the district court's earlier express acknowledgement that Ghanem did so "on the advice of [c]ounsel, which, of course, he is entitled to follow and invoke," we view this comment in context as simply reiterating the lack of additional affirmative evidence of acceptance of responsibility beyond Ghanem's guilty plea and associated admissions. *See Vance*, 62 F.3d at 1157

The district court did not commit clear error in declining to apply an adjustment for acceptance of responsibility. It therefore correctly determined that the applicable guidelines range was 78–97 months.

**B**

Ghanem's remaining procedural challenges all relate to the district court's decision to depart and vary from the guidelines range. We conclude that these challenges also fail.

First, Ghanem contends that the district court procedurally erred by "fail[ing] adequately to explain the sentence selected, including any deviation from the [g]uidelines range." *United States v. Taylor*, 78 F.4th 1132, 1136 (9th Cir. 2023) (citation omitted). However, "[a] district court need not provide a lengthy explanation of the [sentencing] factors in order for its explanation to be sufficient." *United States v. Ali*, 620 F.3d 1062, 1074 (9th Cir. 2010). Instead, it need only "set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). Under that standard, the district court's explanation was sufficient.

Here, the district court stated that it was relying upon the same scope of relevant conduct as at the prior sentencing, including Ghanem's involvement in a deal for delivery and operation of SAMs in Libya. The court summarized the basic facts concerning that deal, including Ghanem's offer of a $50,000 bonus for each aircraft shot down by the SAMs

---

(stating that "[a] defendant's refusal to discuss the offense conduct with the probation officer may reduce the amount of evidence supporting the defendant's claim of acceptance").

operators.  It also outlined Ghanem's actions in arranging the deal with the undercover agent to send arms to Libya in 2015, as well as other examples that underscored the breadth and scope of Ghanem's arms-trafficking activities.  In light of this review of the facts concerning Ghanem's relevant conduct, which we have summarized above, *see supra* at 13–14, the district court concluded that its "significant upward variance and departure is warranted" in light of the nature and scope of Ghanem's activities and the harm to the national security and foreign policy interests of the United States.  The court also considered mitigating factors, including Ghanem's medical problems and statements from his family, but the court explained that these were significantly outweighed by the gravity of Ghanem's conduct.  The extent of the deviation from the guidelines range was also adequately explained: the district court expressly stated that the relevant conduct had not changed from the prior sentencing, and the variance the court selected effectively replicated the prior sentence.

Second, Ghanem argues that the district court failed to address his argument that a significant upward deviation from the guidelines was inconsistent with 18 U.S.C. § 3553(a)(6), which requires courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  The record refutes this contention.  Ghanem's sentencing-disparity argument below relied heavily on the contention that other arms-trafficking defendants had received less severe sentences, and he cited as examples the published decisions in *United States v. Pedrioli*, 978 F.2d 457 (9th Cir. 1992), and *United States v. Tsai*, 954 F.2d 155 (3d Cir. 1992).  Although the district court did not explicitly use the phrase "sentencing disparities" in explaining its

sentence, it specifically explained why it believed that the circumstances of *Pedrioli* and *Tsai* were distinguishable from Ghanem's case. As the district court explained, *Pedrioli* involved a defendant who unlawfully exported a total of around 800 guns during a two-year period, *see* 978 F.2d at 458, which was substantially less serious than Ghanem's conduct. Likewise, although *Tsai* involved military equipment, the district court noted that the scale of the defendant's activities was not comparable. *See Tsai*, 954 F.2d at 165–66 ("No evidence suggests that the volume and scope of exports involved in this case were extremely large.").

Third, Ghanem argues that, even if consideration of the conduct underlying a dismissed charge is constitutionally permissible at a sentencing on the remaining charges, such consideration should be disallowed as *procedurally* unreasonable where "the sentencing enhancement [is] 'a tail which wags the dog of the substantive offense.'" *United States v. Watts*, 519 U.S. 148, 156 n.2 (1997) (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986)); *see also id*. at 156–57 (reserving the question, on which the circuits were then split, "as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence"). We disagree.

As we recently held, en banc, the advisory nature of the guidelines after *United States v. Booker*, 543 U.S. 220 (2005), vitiates any argument for imposing, as a matter of due process, any special procedural rules concerning "large enhancements," and we therefore overruled our prior caselaw holding that sentencing courts must "make factual findings by clear and convincing evidence 'when a sentencing factor has an extremely disproportionate effect

on the sentence relative to the conviction.'" *United States v. Lucas*, 101 F.4th 1158, 1159, 1163 (9th Cir. 2024) (en banc) (citation omitted).[3] Rather, *Lucas* held, "challenges to 'large enhancements . . . should be viewed through the lens of *Booker* reasonableness rather than that of due process.'" *Id.* at 1163 (quoting *United States v. Grubbs*, 585 F.3d 793, 802–03 (4th Cir. 2009), and *United States v. Brika*, 487 F.3d 450, 462 (6th Cir. 2007)). Although *Lucas* focused on whether a heightened pleading standard was required as a matter of due process, its logic applies equally here. The concern about a factor's disproportionate impact on the sentence is ultimately one of *substantive* reasonableness, and should be reviewed under that rubric. *See Brika*, 487 F.3d at 462 (confirming that the relevant "*Booker* reasonableness" review asks whether the large enhancement renders the sentence "*substantively* unreasonable" (emphasis added)); *see also Lucas*, 101 F.4th at 1163 (endorsing *Brika*). We thus reject Ghanem's contention that special procedural limitations apply to the consideration of large enhancements based on conduct underlying dismissed charges.[4]

Fourth, Ghanem argues that the district court erred "by relying on foreign conduct that may not have even been criminal." Ghanem relies on *United States v. Chao Fan Xu*, 706 F.3d 965 (9th Cir. 2013), which held that, under the circumstances of that case, the district court procedurally erred in basing the defendant's guidelines offense level on foreign fraudulent conduct that did not violate

---

[3] *Lucas* thus squarely forecloses Ghanem's further argument that a clear-and-convincing evidence standard should have been applied here.

[4] We address Ghanem's substantive reasonableness arguments in section III, *infra*. We address his Sixth Amendment challenge in section IV, *infra*.

extraterritorially applicable U.S. law.  *Id*. at 992–93.[5]  This principle has no application to the district court's consideration of the conduct underlying the dismissed § 2332g charge, because we explicitly held, in Ghanem's prior appeal, that this statute *does* apply extraterritorially to Ghanem's overseas conduct.  *See Ghanem*, 993 F.3d at 1131–32.    Moreover, *Chao Fan Xu*'s limitations on consideration of foreign conduct in setting the guidelines offense level for an offense under a statute that does not apply extraterritorially do not support Ghanem's view that unlawful foreign acts—such as black-market arms dealing using front corporations and fraudulent documents—may not be considered at sentencing at all.  Such a categorical limitation would be hard to square with 18 U.S.C. § 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Accordingly, we reject all of Ghanem's arguments that the district court "committed significant procedural error." *Carty*, 520 F.3d at 993.

### III

Ghanem also argues that the district court's 360-month sentence was substantively unreasonable.  We review this issue only for abuse of discretion, *see United States v. Brown*, 42 F.4th 1142, 1145 (9th Cir. 2022), meaning that

---

[5] *Chao Fan Xu*'s predicate holding that the overseas fraudulent activity did not violate an extraterritorially applicable U.S. law was based on its categorical conclusion that the RICO statute does not apply extraterritorially.  *See* 706 F.3d at 974–75.  However, *Chao Fan Xu* was expressly abrogated on that point in *RJR Nabisco v. European Community*, 579 U.S. 325, 335 (2016).

"we may reverse if, upon reviewing the record, we have a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors," *United States v. Ressam*, 679 F.3d 1069, 1087 (9th Cir. 2012) (en banc) (citation omitted). We find no abuse of discretion here.

"Congress has instructed sentencing courts to impose sentences that are 'sufficient, *but not greater than necessary*, to comply with' (among other things) certain basic objectives, including the need for "just punishment, deterrence, protection of the public, and rehabilitation." *Holguin-Hernandez v. United States*, 589 U.S. 169, 173 (2020) (quoting 18 U.S.C. § 3553(a)(2) (further citation and internal quotation marks omitted)). In assessing whether the district court's sentence reflects a substantively unreasonable weighing of the sentencing factors listed in § 3553(a), we must "take into account the totality of the circumstances, including the extent of any variance from the [g]uidelines range." *Gall*, 552 U.S. at 51. Where, as here, there was a substantial departure from the guidelines range, our reasonableness review requires that we "give due deference to the district court's decision that the § 3553(a) factors, on [the] whole, justify the extent of the variance." *Id.*; *see also United States v. Gutierrez-Sanchez*, 587 F.3d 904, 908 (9th Cir. 2009) ("The weight to be given the various [§ 3553(a)] factors in a particular case is for the discretion of the district court.").

Under these standards, we conclude that the district court did not abuse its discretion in concluding that a 360-month sentence was warranted under the § 3553(a) factors. The district court permissibly put great weight on the fact that the offense conduct, which specifically concerned planned unlawful arms exports to Libya, was part of a broader pattern

of high-volume, black-market arms-trafficking. That trafficking included Ghanem's dealings with a Georgian arms broker to send SAMs to, and operate them in, Libya. The court properly considered that Ghanem had acted with a callous "lack of respect for human life" and that he had "turned a blind eye to the ultimate destination of the arms he brokered and sold and was indifferent as to whether those weapons were obtained by terrorist organizations or used against civilian targets." The court further stated that, by sending arms to "less stable nations" such as Libya and doing so without regard to whether they landed in the hands of terrorists, Ghanem's "conduct unequivocally endangered the security and foreign policy interests of the United States." The court expressly considered mitigating considerations such as Ghanem's medical conditions and the support of his family members, but found them to be outweighed by the other considerations it had identified. These reasons for substantially varying from the guidelines range reflect a reasonable weighing of the guidelines factor, *see* 18 U.S.C. § 3553(a)(4), in light of the "nature and circumstances of the offense," the defendant's "history and characteristics," the "seriousness of the offense," and the need for "adequate deterrence," *see id*. § 3553(a)(1), (2)(A)–(B).

Contrary to what Ghanem suggests, the district court did not simply disregard the guidelines factor and arbitrarily pick a sentence that was untethered to any objective benchmark. As we have explained, the district court viewed the relevant conduct as being the same as at the prior sentencing. The district court had before it the entire record of the trial, and it found by a preponderance of the evidence that Ghanem had been involved in the delivery and operation of SAMs in Libya that underlay the now-vacated conviction

under § 2332g.  Congress's assessment is that such conduct merits at least a 25-year sentence, *see* 18 U.S.C. § 2332g(c)(1), but the district court was not bound by that congressional judgment here (given that Ghanem's § 2332g conviction was set aside due to improper venue).  But in light of that judgment, we are hard-pressed to say that, under the extreme circumstances of this case, the district court abused its discretion in deciding to fix the extent of its variance from the guidelines range by deciding simply to replicate the prior sentence.  Given the facts of this case, and the deference owed to the district court, we conclude that the district court's "justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.[6]

Ghanem is also wrong in asserting that the district court's sentence fails to give appropriate weight to the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a)(6).  The district court essentially concluded that, due to the unique and extreme facts of this case, a 360-month sentence would not produce an *unwarranted* sentencing disparity when compared with other defendants convicted of arms-export and money-laundering offenses.  On this record, that judgment was not an abuse of discretion.  Moreover, even if the disparity in this case "were assumed to be unwarranted, . . . that factor alone would not render

---

[6] Nor do we view this case as an impermissible example of a sentencing factor serving as a "tail which wags the dog of the substantive offense." *McMillan*, 477 U.S. at 88.  To treat the guidelines range as the "dog" and all of the other considerations noted by the district court as a "tail" would be inconsistent with the established rule that the "[g]uidelines factor" should not "be given more or less weight than any other." *Carty*, 520 F.3d at 991.  In all events, the district court did not abuse its discretion in deciding that, when considered against the surrounding context of uncharged or dismissed conduct, the guidelines range calculation substantially understated the seriousness of Ghanem's offense conduct.

[Ghanem's] sentence[] unreasonable; the need to avoid unwarranted sentencing disparities is only one factor a district court is to consider in imposing a sentence." *United States v. Marcial-Santiago*, 447 F.3d 715, 719 (9th Cir. 2006).

## IV

Finally, Ghanem argues that, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, his sentence is unconstitutional in violation of the Fifth Amendment Due Process Clause and the Sixth Amendment right to a jury trial.

To the extent that Ghanem argues that there is something uniquely suspect about relying on conduct underlying a *dismissed* charge, his argument cannot be squared with *Watts*. There, the Court held that conduct underlying a charge of which the defendant was *acquitted* may be considered at sentencing, where the burden of proof is only a preponderance of the evidence. *Watts*, 519 U.S. at 156–57; *see also United States v. Mercado*, 474 F.3d 654, 658 (9th Cir. 2007) ("We hold that *Booker* has not abrogated the previously prevailing constitutional jurisprudence that allowed sentencing courts to consider conduct underlying acquitted criminal charges."). Ghanem has presented no argument as to why conduct underlying a dismissed charge should be treated with *more* solicitude than conduct underlying a charge rejected by acquittal. *See United States v. Bridgewater*, 950 F.3d 928, 938 (7th Cir. 2020) ("A district court may consider a wide range of conduct at sentencing, including acquitted conduct and dismissed offenses." (citation omitted)).

Ghanem also argues, however, for a broader Sixth Amendment rule that would equally apply to conduct underlying acquittals and dismissed charges and, indeed, to

any conduct not found by a jury or admitted by the defendant. Specifically, Ghanem urges us to adopt Justice Scalia's view that "any fact *necessary* to prevent a sentence from being substantively unreasonable [under *Booker*]— thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury." *Jones v. United States*, 574 U.S. 948, 949–50 (2014) (Scalia, J., dissenting from the denial of certiorari) (emphasis added).[7] Given the loadbearing weight that we have placed on the district court's factual findings in concluding that Ghanem's sentence is substantively reasonable, his sentence here would violate the Sixth Amendment under Justice Scalia's view.

But Justice Scalia's position has not commanded a majority of the Supreme Court, and this court has squarely rejected it:

> The defendants have adopted an argument that Justice Scalia, writing separately, has encouraged litigants to raise in several recent Supreme Court sentencing decisions. . . . Defendants argue that in their case, the relevant maximum sentence is not the maximum established by the [criminal] statutes, but rather the maximum of what we

---

[7] *See also Gall*, 552 U.S. at 60 (Scalia, J., concurring) ("The door therefore remains open for a defendant to demonstrate that his sentence, whether inside or outside the advisory [g]uidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury."); *Rita*, 551 U.S. at 374 (Scalia, J., concurring in part and concurring in the judgment) (arguing that the Sixth Amendment would be violated by a sentence that survives *Booker* reasonableness review only by virtue of the district court's reliance on facts that had neither been found by a jury nor admitted by the defendant).

would consider "reasonable" when reviewing their sentences under § 3553(a) if we were to rely solely on the facts found by the jury. . . .

We reject the defendants' argument, and join the Fourth, Sixth, and Seventh Circuits in holding that "this argument is too creative for the law as it stands." . . . In *Booker*, the Supreme Court rendered the [g]uidelines advisory, permitting a district court to impose a sentence anywhere within the range established by the statute of conviction without violating the Sixth Amendment. The mere fact that, on appeal, we review the sentence imposed for "reasonableness" does not lower the relevant *statutory* maximum below that set by the United States Code.

*United States v. Treadwell*, 593 F.3d 990, 1017 (9th Cir. 2010) (citation omitted), *abrogated on other grounds by United States v. Miller*, 953 F.3d 1095, 1102 (9th Cir. 2020).

\*      \*      \*

For the foregoing reasons, we affirm Ghanem's sentence.

**AFFIRMED.**

COLLINS, Circuit Judge, concurring:

In upholding Ghanem's sentence in this case, my opinion for the panel faithfully applies current precedent concerning the review of federal sentences. I write separately only to point out how this case starkly illustrates a very troubling feature of the precedent we must apply.

In *Booker v. United States*, 543 U.S. 220 (2005), a five-Justice majority of the Supreme Court held, in an opinion by Justice Stevens, that the following core holding of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), applied to the application of the federal sentencing guidelines: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 543 U.S. at 244. Put another way, the jury trial right in "the Sixth Amendment is violated by the imposition of an enhanced sentence under the United States Sentencing Guidelines based on the sentencing judge's determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant." *Id*. at 245 (further opin. for the Court by Breyer, J.) (citation omitted) (summarizing the holding of Justice Stevens's opinion for the Court).

Having found that the guidelines violated the Sixth Amendment to the extent that they relied on judicial fact-finding to increase the maximum permissible sentence, the Court then confronted the question of the proper "remedy" for this Sixth Amendment violation. *Id*. at 245. In an opinion for the Court by Justice Breyer, a different five-Justice majority (consisting of the four dissenters to

*Booker*'s Sixth Amendment holding plus Justice Ginsburg) settled on the following remedy:

> We answer the question of remedy by finding the provision of the federal sentencing statute that makes the [g]uidelines mandatory, 18 U.S.C. § 3553(b)(1) (Supp. IV), incompatible with today's constitutional holding. We conclude that this provision must be severed and excised, as must one other statutory section, § 3742(e) (2000 ed. and Supp. IV), which depends upon the [g]uidelines' mandatory nature. So modified, the federal sentencing statute, *see* Sentencing Reform Act of 1984 (Sentencing Act), as amended, 18 U.S.C. § 3551 *et seq.*, 28 U.S.C. § 991 *et seq.*, makes the [g]uidelines effectively advisory. It requires a sentencing court to consider [g]uidelines ranges, *see* 18 U.S.C. § 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, *see* § 3553(a).

543 U.S. at 245–46. Having excised § 3742(e)'s instruction that the threshold decision to depart from the guidelines should be reviewed de novo, the Court instead adopted an across-the-board instruction to review all sentences for "reasonableness." *Id*. at 262. The Court also expressly declined to limit its remedy to those cases in which the application of the guidelines would violate the Sixth Amendment and to thereby "leave the [g]uidelines as binding in other cases." *Id*. at 266. Accordingly, the Court

held that its remedial revision of the statute would apply systemically in all cases. *Id*.

As applied to the facts of this case, the two portions of the *Booker* opinion produce a disturbing incongruity. Under Justice Stevens's majority opinion in *Booker* (which, for convenience, I will call "*Booker* Part I"), Ghanem has a constitutional right under the Sixth Amendment to have a jury find any fact that would increase his sentence beyond what is allowed under the guidelines regime in light of "the facts established by [his] plea of guilty or a jury verdict." *Booker*, 543 U.S. at 244. Here, there are no facts established by a "jury verdict," because the jury's conviction of Ghanem on the § 2332g charge was vacated on appeal. Moreover, as the panel opinion explains, *see* Opin. at 6–8, the "facts established by [Ghanem's] plea of guilty" are quite limited. *Booker*, 543 U.S. at 244. Those discrete facts support, at most, a guidelines range of 78–97 months, and therefore any upward departure from that range would require additional fact-finding that, under *Booker* Part I, only a jury may make. Thus, under *Booker* Part I, it would be a flagrant violation of Ghanem's Sixth Amendment rights to allow a district judge to make the findings necessary to raise Ghanem's sentence above the 97-month cap that applies under the mandatory guidelines system created by Congress.

But under Justice Breyer's further majority opinion (which I will call "*Booker* Part II"), the "remedy" for this violation of Ghanem's Sixth Amendment rights is to eliminate the very feature of the guidelines *that gives rise to that Sixth Amendment right*—namely, the mandatory nature of the guidelines. That is, the "remedy" for the Sixth Amendment violation that would result from allowing the district judge to find the facts that would waive the guidelines' 97-month cap in Ghanem's case is simply to

waive that cap in *all* cases—thereby allowing the district judge to freely impose a 360-month sentence that is more than triple the top of the guidelines range. The logic of this syllogism is difficult to follow: it effectively eliminates the Sixth Amendment violation by getting rid of the relevant Sixth Amendment right. That is akin to "curing" a patient's illness by killing the patient—that certainly gets rid of the illness, but it loses sight of what is at stake.

One can understand why the four dissenters from *Booker* Part I—who rejected the premise that there was a right to jury fact-finding in connection with the operation of the guidelines system—would prefer this so-called "remedy" to the alternative remedy that would "engraft" *Booker* Part I's "constitutional requirement" of jury fact-finding "onto th[e] statutory scheme" that Congress created. *Booker*, 543 U.S. at 265. And one can likewise understand how four of the Justices in the *Booker* Part I majority concluded that the *Booker* Part II remedy was flawed because, *inter alia*, it "effectively eliminated the very constitutional right *Apprendi* sought to vindicate." *Id*. at 302 (Stevens, J., dissenting); *see also id*. at 313 (Thomas, J., dissenting) (agreeing with much of the analysis in Justice Stevens's dissent). Only one Justice—Justice Ginsburg—joined *both* parts of *Booker*, but she did not write separately to explain how to reconcile the right recognized in *Booker* Part I with the effective elimination of that right in *Booker* Part II. *See* Susan R. Klein, *The Return of Judicial Discretion in Criminal Sentencing*, 39 Valparaiso U. L. Rev. 693, 695 (2005) (describing Justice Ginsburg's joinder in "both competing majority opinions in *Booker*" as "inexplicabl[e]").

We are thus left with a situation in which, under the statutes enacted by Congress and under the Sixth

Amendment as construed in *Booker* Part I, Ghanem's sentence in this case is patently unlawful. But we must nonetheless uphold it because *Booker* Part II eliminated the predicate for Ghanem's Sixth Amendment claim by "engag[ing] in a wholesale rewriting" of the Sentencing Reform Act by facially deleting two of the Act's provisions and then adding—again, across the board—a new, judge-made "reasonableness" review requirement. *Booker*, 543 U.S. at 284 (Stevens, J., dissenting); *see also id*. at 272 (objecting that the *Booker* Part II majority had effectively "repeal[ed] these two statutory provisions"). Justice Stevens's dissent explained at length why the *Booker* Part II remedy was wholly unprecedented, could not be justified by the severability doctrines the majority invoked, and was, at bottom, "an exercise of legislative, rather than judicial, power." *Id*. at 274–91. And, as the facts of this case make clear, the two parts of *Booker* are logically irreconcilable.

As a judge on a court that is "inferior" to the "one supreme Court," *see* U.S. CONST. art. III § 1, I am constrained to follow the clear holding of *Booker* Part II, no matter how flawed it may seem, and I have faithfully done so. But I cannot help but note that, in applying *Booker* Part II, I have been required to affirm a sentence that even the Government's lawyer candidly conceded at oral argument was "absolutely" unlawful under the statute as written by Congress. Only the Supreme Court has the authority, if it sees fit, to address this disquieting anomaly.